UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


<u>B.A., Individually and
as p/n/f of J.F.</u>

    v.

<u>Manchester School District
SAU 37 and Donna M. Varney</u>

Civil No. 15-cv-433-JD
Opinion No. 2017 DNH 141


O R D E R


B.A. brought suit in state court on her own behalf and on
behalf of her minor and disabled son, J.F., alleging federal and
state claims against the Manchester School District ("MSD") and
a former teacher in the school district, Donna M. Varney.  The
defendants removed the case to this court.  MSD moves for
summary judgment, and B.A. objects.[1]  B.A. moves to certify
questions pertaining to the constitutionality of RSA 507-B:5 and
:2 to the New Hampshire Supreme Court, and MSD objects.

I.  <u>Motion to Certify</u>

B.A. moves to certify two questions to the New Hampshire
Supreme Court to determine whether RSA 508-B:5 and :2, as
applied in this case, violate the New Hampshire Constitution.

_____

[1] The court previously granted in part Varney's motion for
partial summary judgment, dismissing B.A.'s claim in Count X and
her procedural due process claim in Count I.

In its response, MSD argues that certification is unnecessary because the issue can be addressed based on existing New Hampshire law.

The New Hampshire Supreme Court provides a means for this court to certify a question of New Hampshire law "which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions" of the New Hampshire Supreme Court.  N.H. Sup. Ct. Rules, Rule 34; see also Old Republic Ins. Co. v. Stratford Ins. Co., 777 F.3d 74, 86 (1st Cir. 2015).  On the other hand, "[w]hen state law is sufficiently clear . . . to allow a federal court to predict its course, certification is both inappropriate and unwarranted." Manchester Sch. Dist. v. Crisman, 306 F.3d 1, 14 (1st Cir. 2002).  Whether to certify questions under Rule 34 is a matter left to the discretion of the court.  Nieves v. Univ. of Puerto Rico, 7 F.3d 270, 275 (1st Cir. 1993).

As demonstrated below in the discussion of B.A.'s state law claims, New Hampshire law is sufficiently clear on the constitutional issues B.A. raises to allow this court to predict the course the New Hampshire Supreme Court would take.  For that reason, the court will decide the constitutional challenge without certifying the questions.

II.  Motion for Summary Judgment

MSD moves for summary judgment on all of B.A.'s claims against it on the grounds that she cannot prove a constitutional violation, that statutory and discretionary function immunity bar her state common law claims, that she has not stated a claim for "intentional tort," and that her claim based on the New Hampshire Constitution is not cognizable.  B.A. objects, arguing that MSD violated J.F.'s substantive due process right to bodily integrity and challenging MSD's assertion of immunity.

A.  Standard of Review

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine dispute is one that a reasonable fact-finder could resolve in favor of either party and a material fact is one that could affect the outcome of the case."  Flood v. Bank of Am. Corp., 780 F.3d 1, 7 (1st Cir. 2015).  The facts and reasonable inferences are taken in the light most favorable to the nonmoving party.  McGunigle v. City of Quincy, 835 F.3d 192, 202 (1st Cir. 2016).  "On issues where the movant does not have the burden of proof at trial, the movant can succeed on summary judgment by showing 'that there is an absence of evidence to support the nonmoving party's case.'"

OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of
Canada, 684 F.3d 237, 241 (1st Cir. 2012) (quoting Celotex Corp.
v. Catrett, 477 U.S. 317, 325 (1986)).

B.  Background

      J.F. was eight years old when he was assigned to Varney's
self-contained classroom for the 2012-2013 school year at Jewett
Street School in the MSD.  The students in the classroom had
various disabilities that precluded them from being integrated
into the school's general population.  The classroom also had two
teaching assistants, Alicia Otis and Brianne Corey.

      Varney was a full-time special education teacher at the
Jewett Street School.  She had previously worked in the MSD, at
a different school, as a teacher's aide.  She received her
degree and certification as a special education teacher in 2007
and began work as a special education teacher at the Jewett
Street School for the 2007 to 2008 school year.

      Jennifer Frietas was the MSD Special Education Coordinator.
Frietas, who was a friend of Varney's and socialized with her
every week, assigned J.F. to Varney's classroom without first
reading J.F.'s Individualized Education Plan ("IEP").  Peter
Lubelczyk was the principal at the Jewett Street School and had
been in that position since August of 2008.  Karen Burkush was
the MSD Assistant Superintendent.

J.F. was born with impairments, and when he was five, he was given diagnoses of a significant Pervasive Developmental Delay and being on the autism spectrum.  He has a limited ability to express himself through language.  J.F. also has impairments in his ability to chew and swallow, which causes him to be at risk of choking and aspiration, and he has experienced difficulty eating that resulted in periods of weight loss.  In addition, J.F. has muscle issues that make it difficult for him to walk and to coordinate other functions such as eating. J.F.'s IEP provided that he needed to be watched during eating because he could choke or gag on food.

MSD had a "Student Code of Conduct" that provided principles "to contribute to a safe and productive learning environment that is of benefit to the entire community."  Obj. to Mot. for S.J. doc. 28, Ex. 28, at 1.  MSD also issued rules as "Manchester School District Policy."  In May of 2012, MSD amended a rule pertaining to the use of physical restraint, which is identified as "Students 116.2" ("Rule 116.2").

Rule 116.2 was "adopted to limit the use of student restraint practices in accord with state law and to define the circumstances and manner in which physical restrain[t] is deemed appropriate."  Doc. 28, Ex. 21.  Rule 116.2 also required the district to "ensure all appropriate personnel are trained in the use of physical restraint procedures" and provided that

"[t]raining of staff shall include a review of NH RSA Chapter 126-U."[2]  Obj. to Mot. for S.J. doc. no. 28-21, at p. 2.  RSA Chapter 126-U prohibits the use of dangerous restraints and behavior control techniques, including restraints or techniques that obstruct "a child's respiratory airway or impairs the child's breathing," that involve "pushing on or into the child's mouth," and that "unnecessarily subject[] the child to ridicule, humiliation, or emotional trauma." RSA 126-U:4, I & IV.  The training required under Rule 116.2 also included Crisis Prevention Instruction.

The MSD Policy requires teachers and staff to report suspected abuse of students.[3]  In addition, teachers, school officials, school nurses and any other child workers are required by state law to report instances of suspected child abuse.  RSA 169-C:29.

Frietas testified at her deposition that special education teachers were included in the personnel to be trained under Rule 116.2.  Burkush testified at her deposition that the MSD superintendent told the school principals that they were

---

[2] RSA Chapter 126-U is titled:  "Limiting the Use of Child Restraint Practices in Schools and Treatment Facilities."

[3] Although neither party provided a copy of that part of the MSD policy, Judy Williams, an expert witness retained by B.A., refers to MSD Policy 147, "Reporting Abuse/Neglect," and states that the policy provided reporting requirements.  MSD did not challenge that statement.

required to implement Rule 116.2.  Lubelczyk, however,

understood that the training required by Rule 116.2 was not

mandatory and that it was not his responsibility to be sure that

Varney received the training.  Lubelczyk did not start recording

who received training until the 2014 to 2015 school year.

Lubelczyk himself did not receive training until 2016.

Varney received all of J.F.'s school records before the

first day of school in August of 2012 and read the records,

including records that explained that J.F. was medically fragile

and had eating problems.  From that information, Varney knew

that J.F. was at risk for choking and gagging and that he was

weak and unsteady on his feet.  Varney also knew that J.F. was

not eating enough food and that he had lost weight.

Because of J.F.'s issue with eating, Varney used a notebook

to record what J.F. ate during the day.  Varney gave the

notebook to B.A. at the end of the day, and B.A. returned it to

Varney in the morning.[4]  B.A. usually read Varney's notes to keep

track of what J.F. was eating and would get help if she did not

understand the words Varney used.

During her deposition, counsel for MSD showed B.A. the

notebook and asked her about a note that Varney wrote, which is

---

[4] B.A. speaks Spanish and has difficulty communicating in
English.  She had a translator for purposes of her deposition
taken in this case.

dated October 9, 2012. In the note, Varney stated that J.F. had "an okay day," that he did not eat his snack, and that when he refused to eat lunch she took his chair away until he ate about a third of the food. B.A. responded that she did not remember reading the note, did not know that Varney was requiring J.F. to stand while eating, and that she would have talked to Varney if she had known of it.

Although nothing in the IEP required or allowed Varney to force J.F. to eat, Varney undertook coercive methods to address his eating. Alicia Otis, one of the teacher's aides in Varney's classroom, saw Varney force feed J.F. five or more times between September of 2012 and January of 2013. Brianne Corey, the other teacher's aide, also saw Varney force feed J.F.

In the feeding procedure, Varney would pinch J.F.'s mouth open with her hands and push food into his mouth. J.F., who was at risk of choking and aspirating due to his disabilities, cried and screamed during this procedure. When J.F. tried to spit out the food, Varney covered his mouth with her hand until he swallowed. Varney later admitted to the Manchester police that her force feeding of J.F. was inappropriate.

Otis was concerned that Varney's roughness would cause J.F. to have a seizure. J.F. would try to rock himself to sleep to avoid the abuse. The force feeding incidents so exhausted J.F. that he would put his head on the desk afterwards and sleep.

In addition to the force feeding, Varney forced J.F. to stand up during lunch if he refused to eat.  These incidents occurred more frequently than the force feeding, approximately three or four days of each school week.  Varney would push on J.F.'s back to get him to stand and would then take his chair away.  J.F. reacted with rocking or falling asleep or falling on the floor and screaming and crying.

Varney also frequently yelled at J.F. to get him to eat. Otis believed Varney yelled at J.F. to scare him into eating and to show him that she was in charge.  Other staff members at the Jewett Street School heard Varney yelling and asked Otis about it.  During the fall, Otis and Corey discussed their disagreement with Varney's tactics and what to do about it.

During the 2011 to 2012 school year, the school nurse heard Varney yelling at her students, which she found to be inappropriate.  Although the nurse did not remember specific dates during her deposition, she testified that she probably reported the behavior to Lubelczyk then.  The behavior continued, however, and the school nurse believes that she complained to Lubelczyk more than once about Varney's treatment of her students.

During the 2012 to 2013 school year, another teacher at the school told one of Varney's teacher's aides that she complained to Lubelczyk about Varney's conduct.  Lubelczyk met with Varney

to discuss the tone she used with her students and believed that Varney understood that she needed to speak reasonably to children.  Lubelczyk concluded that Varney was using "tough love" because she wanted her students to succeed.  Lubelczyk asserts that he was not aware of any physical abuse by Varney. The school nurse observed Varney yelling at J.F. to eat more than once and yelling at him to eat even after he had a feeding tube.

In April of 2013, Otis complained to Lubelczyk about Varney's treatment of her students.  A paraprofessional from another classroom reported an incident that occurred during bus dismissal on April 10, 2013, when Varney was overly forceful with one of her students.  Lubelczyk reported the complaints to Burkush who instructed Lubelczyk that Varney must leave the building immediately and that the complaints must be reported to the Department for Children, Youth, and Families.

Varney left the building and never returned.  She eventually resigned her position.  Varney was charged with simple assault based on her treatment of another student in her classroom.[5]  A special education expert retained by B.A., Judy Williams, MEd, CAGS, states that Varney did not have the appropriate credentials and training to teach a special

---

[5] The investigation into Varney's conduct with that child uncovered abuse of other children in her classroom.

education self-contained classroom.  Williams also states that
Varney's yelling should have alerted Lubelczyk to closely
monitor Varney's conduct in the classroom, which Lubelczyk did
not do.

B.A. brought suit against MSD and Varney, alleging federal
claims under 42 U.S.C. § 1983 and state law claims.  B.A.
alleges in Count II that MSD violated J.F.'s rights under the
Fourth and Fourteenth Amendments and alleges in Count III that
MSD violated the Americans with Disabilities Act ("ADA") and the
Rehabilitation Act.  B.A. alleges claims for battery, assault,
and "intentional tort" against Varney in Counts IV, V, and IX.
In Counts VII, VIII, and XI, B.A. alleges that MSD was negligent
in its supervision, custody, care, and education of J.F., that
MSD was negligent in hiring and retaining Varney as a teacher,
and that MSD violated J.F.'s right to equal protection under the
New Hampshire Constitution.

MSD moves for summary judgment on Count II on the grounds
that B.A. cannot prove a violation of the Fourth Amendment,
substantive due process, or a constitutional violation based on
a failure to train.  MSD also contends that B.A. cannot prove a
violation of the ADA or the Rehabilitation Act, that it is
protected from liability on the state law claims by immunity
provided by RSA 507-B:5 and discretionary function immunity,

that Count IX does not state a cause of action, and that B.A. cannot prove a claim based on the New Hampshire Constitution.

B.A. objects to summary judgment, arguing that her substantive due process claim in Count II survives summary judgment because a genuine issue of material fact exists as to whether MSD was deliberately indifferent to the need to train and supervise its staff. She contends that the ADA and Rehabilitation Act claim in Count III is viable because a genuine issue of material fact exists as to whether J.F. was a disabled student in need of accommodation for eating and whether MSD was deliberately indifferent to J.F.'s needs by failing to prevent Varney's actions.

In support of her state law claims, B.A. challenges MSD's reliance on RSA 507-B:5 on the ground that statutory immunity, as applied in this case, violates the New Hampshire Constitution. B.A. also argues that discretionary function immunity does not apply here. B.A. contends that she should be allowed to pursue a remedy under the New Hampshire Constitution if her state law claims against MSD are barred by immunity.

C. Section 1983 Claim – Count II

B.A. alleges in Count II that MSD violated J.F.'s Fourth Amendment rights and his Fourteenth Amendment substantive due process rights. In response to summary judgment, B.A. has not

pursued a claim of violation of the Fourth Amendment. Therefore, MSD is entitled to summary judgment on Count II to the extent the claim was premised on a violation of the Fourth Amendment.[6]

MSD also contends that B.A. cannot prove a violation of substantive due process guaranteed by the Fourteenth Amendment. In support, MSD argues that Varney's conduct did not violate J.F.'s substantive due process rights and that B.A. cannot show that MSD's custom or policy caused J.F.'s injury. In response, B.A. contends the substantive due process claim is premised on a school district's duty to supervise and protect severely disabled students and MSD's deliberate indifference to the need to supervise and train Varney. She further contends that MSD was deliberately indifferent to J.F.'s substantive due process right to bodily integrity.

1. <u>Municipal Liability under Section 1983</u>

To prove that MSD violated J.F.'s substantive due process rights, B.A. must first show that J.F. was harmed by a constitutional violation and then that MSD is responsible for the violation. <u>Young v. City of Providence</u>, 404 F.3d 4, 25 (1st Cir. 2005). The court concluded, in the context of Varney's

---

[6] B.A. does not assert a procedural due process claim against MSD.

motion for summary judgment, that a factual dispute remains as to whether Varney's treatment of J.F. violated his right to substantive due process.[7]  Therefore, whether or not J.F. was harmed by a constitutional violation cannot be resolved on summary judgment.

With respect to MSD's violation of J.F.'s substantive due process rights, § 1983 does not provide a cause of action based on vicarious liability of a municipality for the conduct of its employees.[8]  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  To hold a municipality liable under § 1983, a plaintiff must show that the "municipality itself cause[d] the constitutional violation at issue."  City of Canton v. Harris, 489 U.S. 378, 385 (1989).  For that reason, a plaintiff must prove that the municipality's official policy caused the violation.  Connick v. Thompson, 563 U.S. 51, 60 (2011).

------

[7] MSD argues that B.A. approved Varney's abuse of J.F. by not challenging her conduct in response to an entry in the notebook passed between Varney and B.A. in which Varney wrote that she had required J.F. to stand while eating on one day in October of 2012.  Even if B.A.'s lack of response to that note could be deemed to be acquiescence, which is unlikely given the language issues and other circumstances, MSD cites no case or other authority to show that a parent can waive a child's constitutional rights by failing to object to abuse.

[8] School districts in New Hampshire are treated as municipalities for purposes of § 1983.  See TF v. Portsmouth Sch. Dist., 2016 WL 3815349, at *2 (D.N.H. July 12, 2016).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61. A municipality's decision not to train employees "about their legal duty to avoid violating citizens' rights may rise to the level of official government policy for purposes of § 1983" when the failure to train amounts "to deliberate indifference to the rights of persons with whom the untrained employees come into contact."[9] Id. (internal quotation marks omitted); Kennedy v. Town of Billerica, 617 F.3d 520, 531-32 (1st Cir. 2010). In addition, the deficiency in the municipality's training or supervision must be closely related to the plaintiff's injury. Canton, 489 U.S. at 391.

a. Deliberate indifference

Deliberate indifference for purposes of showing an official policy not to train or supervise requires notice that the training or supervision is deficient. Connick, 563 U.S. at 62.

---

[9] The standard for municipal liability based on a failure to train is also used to assess municipal liability for a failure to supervise and other failures to act to prevent constitutional violations. See, e.g., Mize v. Tedford, 375 F. App'x 497, 500 (6th Cir. 2010); Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000); Davis v. City of Ellensburg, 869 F.2d 1230, 1235 (9th Cir. 1989); E.G. by Gonzalez v. Bond, 2016 WL 8672774, at *11 (N.D. Tex. Sept. 9, 2016); Consolo v. George, 835 F. Supp. 49, 51 n.1 (D. Mass. 1993).

For that reason, deliberate indifference generally requires "a pattern of similar constitutional violations by untrained employees." Id. "A showing of simple or even heightened negligence will not suffice." Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 407 (1997).

In rare cases, a pattern of similar violations may not be required where the municipality's knowledge of the highly predictable consequence of a failure to train or supervise would be sufficient to show deliberate indifference. Id. at 63-64 (discussing the exception noted in Canton, 489 U.S. at 390, n.10). That is, deliberate indifference may be shown when there is a lack of training or supervision and where it is known or obvious that inadequate training or supervision is highly likely to cause a violation of constitutional rights. Canton, 489 U.S. at 390, n.10. "A school district may be held liable for inadequate training, supervision, or hiring where the failure to train, hire, or supervise amounts to deliberate indifference to the rights of those with whom [its] employees will come into contact." Benacquista v. Spratt, 217 F. Supp. 3d 588, 600 (W.D.N.Y. 2016) (internal quotation marks omitted).

B.A. contends that this case falls into the Canton exception where the need to train and supervise to avoid a highly likely constitutional violation was sufficiently obvious that MSD's failure to do so constitutes deliberate indifference.

16

B.A. argues that the need to train and supervise special
education teachers in ways to deal with their severely disabled
students to maintain a safe and appropriate environment is well-
established and obvious.  In support, B.A. cites the opinions
provided by her expert, Judy Williams.  B.A. also contends that
the record supports an inference that the staff and
administration at the school knew Varney had "propensities to
use illegal or highly inappropriate power-based techniques to
control the behavior of disabled students in her self-contained
classroom before and during the 2012-2013 school year."

It is undisputed that neither Varney nor the teacher's
aides in her classroom were trained to avoid abusive treatment,
in the lawful and appropriate use of physical restraints, or in
the requirements for reporting abuse.  MSD had a written school
district policy, which included a statement about the use of
physical restraint on students, and a policy that required
reporting suspected abuse.  In addition, state law restricts the
use of physical restraints and abusive treatment of children and
requires teachers and school personnel to report suspected
abuse.  Further, under the Fourteenth Amendment, every person
has a substantive due process right to bodily integrity.
Washington v. Glucksberg, 521 U.S. 702, 720 (1997); Albright v.
Oliver, 510 U.S. 266, 272 (1994).

17

The record shows that MSD knew of the risks of harm, which could include violation of constitutional rights, by the improper use of physical restraints and abusive treatment because it promulgated policies to address and train its staff to avoid those risks.  Indeed, the risks of harm, including the risk that a disabled child's substantive due process right to bodily integrity could be violated in the absence of adequate training and supervision of teachers, would seem to be obvious. The magnitude of the risk is reinforced by the New Hampshire statutes that specifically address the physical restraint and other abusive treatment imposed by Varney and that require school officials and staff to report suspected child abuse.

In addition, MSD learned by the end of the 2012 school year that a special education teacher at another Manchester school did not have proper training and was using abusive treatment to control the students.  That teacher was fired and criminally convicted because of her treatment of the students.  In response to that incident, Burkush and the superintendent of MSD directed MSD principals to make sure that their staff knew of the mandatory reporting obligations and offered training.  MSD, however, did not follow up to be sure that the special education teachers in the district, including Varney and the teacher's aides in her classroom, were trained and properly supervised.

Lubelczyk did not ensure that his staff knew of the mandatory reporting requirements or offer training.  Lubelczyk did not mention the 2012 incident in his affidavit or acknowledge that he was directed to ensure his staff's understanding of the reporting requirements.  Lubelczyk himself did not receive the mandatory training until four years later, in 2016.  Therefore, the facts support an inference that MSD knew that training was necessary to prevent harm to students in special education classes but failed to provide training.[10] Alternatively, the facts could support a conclusion that it was obvious that training was necessary.

Further, there is sufficient evidence to raise a factual dispute as to what Lubelczyk knew about Varney's treatment of her students.  Although MSD asserts that neither Lubelczyk nor any other administrator knew that Varney was mistreating her students, including J.F., the record shows that Lubelczyk had one or more complaints from the school nurse and another teacher about Varney.[11]  The teacher's aides said that Varney's yelling could be heard outside her classroom and that other staff

_____

[10] See, e.g., Spady v. Bethlehem Area Sch. Dist., 2016 WL 6995024, at *8 (E.D. Pa. Nov. 29, 2016).

[11] MSD admits that Varney's yelling at her students, along with her other treatment of J.F. and his classmates, was improper. While MSD attempts to excuse Varney's conduct as well-intentioned, the record does not necessarily support that view.

members asked them about Varney's conduct.  Lubelczyk was
sufficiently concerned to meet with Varney once but concluded
that Varney's treatment of her students was "tough love."[12]
Lubelczyk did not follow up with Varney to be sure that she was
acting appropriately.[13]

As such, the facts allow a reasonable inference that
Lubelczyk had notice that Varney required training and
supervision to avoid abusing her students, including J.F., but
failed to provide either.  Even if Lubelczyk did not have actual
notice of the risk of harm to J.F., the prior incident at
another Manchester school should have alerted MSD of the danger
associated with its lack of training and supervision of special
education teachers.  Finally, based on MSD's own rules and
policies, combined with state and federal constitutional law
aimed at protecting children from abuse, a triable issue exists
as to whether it was obvious that training and supervision were

---

[12] Lubelczyk does not explain what he meant by "tough love" or
whether his concept of "tough love" complied with MSD policy and
state and federal law.  Indeed, Lubelczyk had not been trained
in the MSD policies applicable to the treatment of students.

[13] A failure to take any meaningful action in response to
notice of potential abuse of a child can be a deliberately
indifferent response.  Doe by Watson v. Russell County Sch. Bd.,
2017 WL 1374279, at *9 (W.D. Va. April 13, 2017).

necessary to avoid having Varney use inappropriate, illegal, and harmful control methods on her students.[14]

b.  Causation

The failure to train or supervise must also be closely related to the constitutional injury. Canton, 489 U.S. at 391. As such, the failure to train or supervise must be at least a partial cause of the constitutional violation. Whitfield v. Melendez-Rivera, 431 F.3d 1, 10 (1st Cir. 2005).

Judy Williams, B.A.'s expert witness, provided her opinion that Varney should have been trained in Positive Behavioral Intervention and Crisis Prevention Intervention and in the requirements of RSA chapter 126-U, all of which were required training under MSD policy.  If properly trained, Varney would have known not to use power-based control techniques, such as yelling, and would have known to de-escalate rather than escalate the behavior of her students.  Williams also believes that Lubelczyk should have provided supervision of Varney, including interviewing other staff members who worked with her and near her, but did not do so, despite warnings about her

---

[14] When state and federal law provide "extensive guidance" to prevent abuse of students, the school's "complete failure to train teachers and employees on how to spot, investigate, and address" such conduct amounts to deliberate indifference. Doe by Watson, 2017 WL 1374279, at *8.

conduct.  Williams's opinion is that if MSD had supervised
Varney, she would not have been teaching or would not have used
treatment that violated the law.

As such, a factual issue remains as to the causation
element of showing official policy for purposes of MSD's
liability under § 1983.

### 2.  Substantive Due Process Claim That Remains for Trial

B.A.'s claim against MSD in Count II is that MSD violated
J.F.'s substantive due process rights under the Fourteenth
Amendment by being deliberately indifferent to the need to train
and supervise Varney and the teacher's aides in Varney's
classroom to prevent the abuse of J.F. that occurred.

### D.  ADA and Rehabilitation Act Claim – Count III

In Count III, B.A. contends that MSD violated the ADA and
the Rehabilitation Act by depriving him of services he was
entitled to receive.  B.A. focuses the claim more narrowly in
her objection to summary judgment, stating that J.F. was a
disabled student who required accommodations for eating and that
MSD was deliberately indifferent to J.F.'s need for
accommodation and was deliberately indifferent to Varney's abuse
of J.F. arising from his eating disability.  MSD seeks summary
judgment on the ground that the record lacks evidence that
Varney's treatment of J.F. was intentionally discriminatory.

Title II of the ADA and the Rehabilitation Act prohibit schools that receive federal funds from discriminating against a student based on a disability and from excluding a student with a disability from school programs. Nunes v. Mass. Dep't of Corr., 766 F.3d 136, 144 (1st Cir. 2014); Doe v. Bradshaw, 203 F. Supp. 3d 168, 191 (D. Mass. 2016). To succeed on a disability discrimination claim of this type, a plaintiff must show "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability." Buchanan v. Maine, 469 F.3d 158, 170-71 (1st Cir. 2006). While the ADA and Rehabilitation Act do not require that specific services be provided to qualified disabled persons, both Acts prohibit discrimination against qualified disabled persons with respect to services that are available. Id. at 174.

MSD does not dispute that J.F. is a qualified individual with a disability and apparently does not dispute that J.F. did not receive reasonable accommodation for his eating disability. In support of summary judgment, MSD argues that J.F. cannot recover compensatory damages for a violation of the ADA or the Rehabilitation Act absent intentional discrimination. See

_Nieves-Marquez v. Puerto Rico_, 353 F.3d 106, 126-27 (1st Cir. 2003). MSD contends that Varney did not act with discriminatory animus but instead was attempting to address J.F.'s medical issue of "failing to thrive and losing weight." For that reason, MSD contends, Varney was trying to help J.F. rather than discriminating against him.

Varney's motives in force feeding J.F. are unclear. When asked about her actions to force J.F. to eat during her deposition, Varney invoked the protection of the Fifth Amendment, which could lead to an inference that her intentions were not appropriate.[15] In addition, Varney also continued to force J.F. to eat even after the feeding tube was implanted. When the school nurse told Varney that J.F. did not have to be fed, Varney responded that J.F. was being defiant.

Therefore, MSD has not shown that it is entitled to summary judgment on the ADA and Rehabilitation Act claim in Count III based on a lack of evidence of discriminatory intent.

E.   State Law Claims

B.A. brings claims of battery, assault, negligence, and "intentional tort" against Varney in Counts IV, V, VI, and IX. Although B.A. includes no allegations as to MSD's vicarious

---

[15] In a civil case, an adverse inference may be drawn from a party's invocation of her Fifth Amendment right. _Baxter v. Palmigiano_, 425 U.S. 308, 318 (1976).

liability for Varney's conduct in those counts, MSD presumes that B.A. is asserting a theory of vicarious liability.  In her objection, B.A. states that MSD would be liable for Varney's actions under the doctrine of respondeat superior.  Because MSD construes the complaint to assert claims of vicarious liability and B.A. apparently intended that result, the court will also presume that B.A. brings vicarious liability claims.

In addition, B.A. alleges three state law claims against MSD, directly.  In Count VII, B.A. alleges that MSD was negligent in its supervision, custody, care, and education of J.F., and in Count VIII, B.A. alleges that MSD was negligent in hiring and retaining Varney as a teacher.  In Count XI, B.A. alleges that MSD's conduct violated J.F.'s rights under the New Hampshire Constitution, Part I, Article 2.

MSD seeks summary judgment on all of the state law claims. MSD asserts that the state law claims, except the constitutional claim in Count XI, are barred by municipal immunity under RSA 507-B:5 and that Counts VII and VIII are also barred by discretionary function immunity.  MSD also challenges the "intentional tort" claim on the merits.  As to the constitutional claim in Count XI, MSD contends that B.A. fails to state a cause of action for violation of the New Hampshire Constitution.  B.A. objects to summary judgment on her state law claims.

1. <u>Statutory Immunity</u>

B.A. acknowledges that if RSA 507-B:5 were applied to her negligence claims in Counts VI, VII, and VIII, those claims would fail.  She argues, however, that RSA-B:5 and :2, as applied to her claims, violate the New Hampshire Constitution's guarantees of the right to a remedy and equal protection.  She also argues that statutory immunity does not apply to her intentional tort claims in Counts IV, V, and IX.

Under New Hampshire law, governmental units are immune from liability for personal injury except as otherwise provided by statute.  RSA 507-B:5.  A school district is a governmental unit for purposes of RSA 507-B:5.  RSA 507-B:1, I.  A governmental unit is not immune, however, for personal injury "arising out of ownership, occupation, maintenance or operation of all motor vehicles, and all premises."  RSA 507-B:2.  The exception provided by RSA 507-B:2 is limited to the operation of the governmental unit's physical premises.  <u>Lamb v. Shaker Reg'l School Dist.,</u> 168 N.H. 47, 51 (2015).

a. <u>Constitutionality</u>

B.A. argues that the immunity afforded MSD in this case violates the New Hampshire Constitution.  Specifically, B.A. argues that RSA 507-B:5 deprives J.F. of a remedy in violation

of Part I, Article 14 and deprives J.F. of equal protection in violation of Articles 2 and 12.  MSD provided a response to B.A.'s constitutional challenge in which it contends that the New Hampshire Supreme Court has found that RSA 507-B:5 does not deprive a plaintiff of a right to a remedy and that B.A. has not raised a cognizable equal protection claim.

### i.  Right to a Remedy

The purpose of Article 14 "is to make civil remedies available and to guard against arbitrary and discriminatory infringements upon access to courts." Huckins v. McSweeney, 166 N.H. 176, 180 (2014).  The immunity provided by RSA 508-B:5 and :2 does not deprive a plaintiff of the right to a remedy protected by Article 14 when the plaintiff can bring a claim for damages directly against the tortfeasor.  Id.  Because B.A. brought claims for damages on behalf of J.F. against Varney, she has not shown that the immunity provided in RSA 508-B:5 and :2 violates the right to a remedy in her case.

### ii.  Equal Protection

B.A. contends that immunity under RSA 508-B:5 and :2 violates the right to equal protection.  In support, she contends that the immunity provided to MSD causes her to be deprived of a remedy while plaintiffs who are injured by private actors are not so deprived.  As a result, B.A. argues, RSA 508-

27

B:5 and :2 are subject to intermediate level scrutiny and MSD must show that the immunity provided serves an important governmental interest.

As the New Hampshire Supreme Court has explained, a claim that a statute violates the right to a remedy and to equal protection may be addressed in a single analysis. Lennartz v. Oak Point Assocs., P.A., 167 N.H. 459, 462 (2015). The right to equal protection under the New Hampshire Constitution is a guarantee "that all persons similarly situated should be treated alike." Id. (internal quotation marks omitted). If a classification treats similarly situated persons differently with respect to an important substantive right, such as the right to a remedy, the classification must meet the intermediate scrutiny test, which requires a showing "that the challenged legislation be substantially related to an important governmental objective." Id. at 463 (internal quotation marks omitted). The burden to show that that the challenged legislation meets the intermediate scrutiny test "now rests with the party seeking to uphold the statute." Id.

Because the New Hampshire Supreme Court has already held that RSA 508-B:5 and :2 do not deprive a plaintiff of a remedy as long as the plaintiff can bring a claim for damages against the tortfeasor, which is the case here, no violation of an important right has occurred. B.A. does not allege that J.F.

belongs to a suspect classification.  In the absence of a suspect classification or the violation of an important right, the rational basis test applies to an equal protection challenge.  See Signs for Jesus v. Town of Pembroke, --- F. Supp. 3d ---, 2017 WL 394493, at *11 (D.N.H. Jan. 27, 2017).  Under the rational basis test, "the party challenging the statute bears the burden of showing that the statutory classification does not bear a rational relationship to a legitimate state interest."  State v. Ploof, 162 N.H. 609, 627 (2011).

B.A. argues that statutory immunity causes J.F. to be treated differently than a child injured by a teacher at a private school.  The New Hampshire Supreme Court has already decided, however, that, because of the important governmental interests involved when government entities are sued, statutory immunity does not violate the equal protection guarantee, even for some intentional torts.  Huckins, 166 N.H. at 182.  The important governmental interests identified in Huckins amply support the constitutionality of statutory immunity for negligence actions under both the intermediate scrutiny and rational basis tests.  B.A. has not carried her burden to show that statutory immunity for public school districts does not bear a rational relationship to the governmental interests identified in Huckins.

b.  Immunity for Intentional Torts

MSD contends that it is immune from liability for the intentional torts that B.A. alleges in Counts IV, V, and IX. B.A. objects, arguing that Varney did not have a reasonable belief that her force feeding and other treatment of J.F. were lawful.  The immunity provided by RSA 507-B:5 covers intentional torts by municipal employees as long as the employee acted within the scope of his or her official duties and reasonably believed that his or her intentional acts were lawful.  Farrelly v. City of Concord, 168 N.H. 430, 443 (2015).

For the reasons discussed above in the context of B.A.'s ADA and Rehabilitation Act claim, there is at least a factual dispute as to whether Varney reasonably believed that her treatment of J.F. was lawful.  Therefore, MSD has not shown that it is entitled to summary judgment on B.A.'s claims of intentional torts in Counts IV, V, and IX based on statutory immunity.

c.  Result of Application of Immunity

The immunity provided under RSA 508-B:5 and :2, as applied in this case, does not violate the New Hampshire Constitution. As a result, MSD is immune from liability for negligence as alleged in Counts VI, VII, and VIII.  A factual dispute

precludes summary judgment based on statutory immunity as to the intentional tort claims, Counts IV, IV, and IX.

MSD also contends that discretionary function immunity bars B.A.'s negligence claims in Counts VII and VIII.  Because the immunity provided by RSA 507-B:5 applies to those claims, it is not necessary to consider whether they would also be barred by discretionary function immunity.

## 2.  Merits – "Intentional Tort" Claim – Count IX

MSD also moves for summary judgment on Count IX, which is titled "Intentional Tort," on the ground that it does not state a cognizable theory of liability.  B.A. did not respond to the challenge on the merits of Count IX.

In Count IX, B.A. alleges that Varney had a special relationship with J.F. as his teacher and had a duty to use reasonable care in his care and supervision in compliance with the rules and regulations provided by the MSD, along with rights secured by the New Hampshire Constitution, New Hampshire common law, and various federal statutes.  B.A. further alleges that Varney intentionally breached her myriad duties by her treatment of J.F. in attempting to force feed him.

Such general references to the common law and unspecified state and federal standards are not sufficient to show that B.A. is entitled to relief.  See Fed. R. Civ. P. 8(a)(2).  In

31

addition, Count IX appears to repeat claims made in other counts, which is unnecessarily repetitive and confusing. Therefore, MSD is entitled to summary judgment on Count IX.[16]

### 3.  Constitutional Violation – Count XI

In Count XI, B.A. alleges that "[t]he conduct and action of defendant MSD was done negligently, recklessly, intentionally and/or with a deliberate indifference to the rights of the plaintiff J.F. and/or was done unnecessarily and wantonly with the purpose of causing harm and inflicting pain, emotionally and otherwise physically abusing J.F. [which violated J.F.'s rights to due process and equal protection] guaranteed under Part I, Article 2 of the New Hampshire State [sic] Constitution."  Am. Compl. Doc. 11 at ¶ 66.  MSD moves for summary judgment on the ground that no private right of action exists for damages under Article 2.  In response, B.A. asks this court to create an appropriate constitutional remedy because the immunity statutes deprive her of a remedy against MSD.

The New Hampshire Supreme Court has held in similar circumstances that no constitutional tort exists to redress

---

[16] Count IX alleges that Varney committed an "intentional tort," so that MSD's liability, if any, would be vicarious. Varney did not move for summary judgment on Count IX.  Because the claim does not state a cognizable cause of action against Varney, hence obviating any vicarious liability of MSD, the claim is dismissed as to Varney as well as to MSD.

violation of Article 2 when another remedy exists.  Marquay v. Eno, 139 N.H. 708, 721-22 (1995); see also Khater v. Sullivan, 160 N.H. 372, 379-80 (2010).  As is explained above, J.F. is not without a remedy.  In addition, a new constitutional tort would be incompatible with statutory immunity provided to governmental entities.  See Rockhouse Mt. Prop. Owners Ass'n, Inc. v. Town of Conway, 127 N.H. 593, 600 (1986).  Therefore, the court will not recognize the new cause of action under the New Hampshire Constitution that B.A. proposes.  See Ali v. Warden, N. N.H. Corr. Facility, 2013 WL 3367098, at *4 (D.N.H. July 3, 2013).

Conclusion

For the foregoing reasons, MSD's motion for summary judgment (document no. 22) is granted as to Counts VI, VII, VIII, IX, and XI.  Count IX is dismissed as to both MSD and Varney.

B.A.'s remaining claim in Count II is that MSD violated J.F.'s substantive due process rights under the Fourteenth Amendment by being deliberately indifferent to the need to train and supervise Varney and the teacher's aides in Varney's classroom to prevent the abuse of J.F. that occurred.

The motion for summary judgment is otherwise denied.  The remaining claims against MSD are that part of Count II identified above, Count III, Count IV, and Count V.

The plaintiff's motion for certification (document no. 29) is denied.

Now that the defendants' motions for summary judgment have been resolved, the parties know what claims will remain in the case for trial.  Trial is scheduled for the period beginning on October 3, 2017.  Before the parties and the court spend the considerable time and resources necessary to prepare for trial, the parties are expected to use their best efforts to resolve all or part of the remaining claims.

To that end, counsel shall carefully examine their claims and defenses to evaluate their viability, the proof necessary to support them, and how they will present those matters to a jury. In their mediation statement filed on April 18, 2017, the parties represented that they were discussing mediation to be held at a later date.  If they have not already done so, the court expects the parties to mediate before trial.

Counsel shall file a status report, **on or before August 9, 2017,** to inform the court as to whether mediation has occurred, and if not, when it is scheduled to be held.

SO ORDERED.

Joseph DiClerico, Jr.
United States District Judge

July 18, 2017

```
cc:  Erin J. M. Alarcon, Esq.
     Mark S. Bodner, Esq.
     Emile R. Bussiere, Jr., Esq.
     Keith F. Diaz, Esq.
     John P. Fagan, Esq.
     Robert J. Meagher, Esq.
     Michael B. O'Shaunessy, Esq.
     James G. Walker, Esq.
```